# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JIN FU ZHONG,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 08-2204** |
| | : | |
| **KATHLEEN SWEENY, et al.,** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                              **March 28, 2011**

Jin Fu Zhong was the president and sole shareholder of Tong Shing Restaurant, Inc., an "S" corporation[1] which owned and operated Tong Shing Restaurant in Nazareth, Pennsylvania. Mr. Zhong brought this case under 42 U.S.C. § 1983 alleging that several agents[2] of the Pennsylvania Department of Agriculture violated various constitutional rights, conspired to interfere with those rights, and violated the RICO Act and various Pennsylvania statutes. These claims stem from the agents' involvement in inspections and prosecutions of the restaurant over the years. The remaining defendants[3] have filed a motion for summary judgment to which the plaintiff has responded. For the following

---

[1] An "S" corporation is defined as a small business corporation that is treated for federal tax purposes as a partnership. See http://research.lawyers.com/glossary/S-corporation.html

[2] I note that Mr. Zhong brought this action against the defendants in their individual capacities only. An action against them in their official capacities or against the Pennsylvania Department of Agriculture would be the same as one against the Commonwealth of Pennsylvania, which is immune from suit in federal court under the Eleventh Amendment to the United States Constitution.

[3] Three defendants remain in this case. Two other defendants were dismissed on September 30, 2009. See Document #33.

reasons, I will grant the motion in its entirety and enter judgment in favor of the defendants.

## I. BACKGROUND[4]

Tong Shing Restaurant purchased its equipment, fixtures, furniture, and machinery from Mr. Zhong and his wife.  It was located in a commercial building owned by the Zhongs to whom it paid rent.  The S Corporation used the same facility for its offices.  Mr. Zhong managed Tong Shing, and his wife worked there and managed it on occasion.  Mr. Zhong understands "plain English," but not professional words.  Mrs. Zhong's command of English is much more limited.

Defendants Kathleen Sweeny and Willie Phillips are food sanitarians with the Pennsylvania Department of Agriculture, Bureau of Food Safety.  Defendant William Kinder was their supervisor until he retired in April 2005.  Miss Sweeny was the agent assigned to the area in which the restaurant was located.  Her inspections of the restaurant lasted four or five hours typically.  During inspections, Agent Sweeny would sometimes discard food or request a voluntary closure.  The Bureau of Food Safety would ask for a voluntary closure when unsanitary conditions pose a health threatening situation.  If a restaurant owner or manager refuses, the facility may be shut down through a formal license suspension or revocation process.  The Bureau does not close restaurants very often.  It is a major action.  When Agent Sweeny conducted her inspections, she would try

---

[4]  The majority of facts are taken from the parties' statements of undisputed facts.  Other facts are cited to the record where necessary.

to communicate by showing as well as talking.  She would prepare a report and explain in a simple way what needed to be done to correction violations.  If Agent Sweeny inspected a restaurant, it was her practice to also do a frozen dessert inspection if the restaurant served frozen desserts.  If the Bureau sent a warning letter, the practice was to re-inspect the establishment soon afterward.  From time to time, Bureau supervisors would accompany the agents and observe their inspections.

It was Mr. Zhong's practice to give discounts at his restaurant to his "friends."  Because he considered her a friend, Mr. Zhong also gave Agent Sweeny a discount for takeout food, and when she and her husband would come for dinner every month or two.  Agent Sweeny denies receiving or knowing about a discount, because her husband always paid the bill.  In fact, Agent Sweeny testified that she stopped eating at the restaurant before March 2003.  Mr. Zhong alleges that the last discount Agent Sweeny or her husband received was on March 23, 2003, when a waiter gave them a twenty percent discount instead of the usual fifty percent discount.  A Bureau agent was not required to disclose receiving a discount from a restaurant.  It is unclear, however, whether grounds for discipline existed if an agent's spouse received a discount from a restaurant in the agent's assigned area.

The Bureau policy is not to re-inspect a facility while a prosecution was pending.  Agents' reports are public information.  Before 2006, the public accessed inspection reports by requesting them by facility or date.  Agents had access to all other agents'

reports on the 2006 software and on the prior system which was in place before 2000.

The record contains a concise history of the Bureau's dealings with Tong Shing Restaurant over the years. It is important to note that on September 30, 2009, I dismissed all civil rights claims in the amended complaint which were based on events that preceded May 12, 2006 because of the two-year statute of limitations. I also dismissed any part of the RICO claim which had been based on events that preceded May 12, 2004 because of the four-year statute of limitations. <u>See</u> Document #33. Those events are presented here for background purposes only.

### A.    Events Leading Up to May 12, 2004 – Outside the Statute of Limitations for Civil Rights Claims and RICO claim

Agent Sweeny approved the plans and conducted the first inspection of Tong Shing Restaurant before being issued its license in 1998. In March 2001, Agents Sweeny and Phillips found violations of the Food Code at the restaurant. A re-inspection ten days later showed repeat violations, including critical ones. A couple months later, Supervisor Kinder wrote Tong Shing Restaurant a warning letter, referring to the two March inspections. Mr. Zhong responded that "deviation items" had been corrected.

In January 2002, Agent Sweeny found fourteen violations during her inspection, some of them critical. Two of those were the violations found in 2001 which the plaintiff had reported as corrected. The inspection resulted in prosecution of the facility. Also, a warning letter was sent regarding high lab counts for frozen dessert in violation of the Frozen Dessert Law. Mr. Zhong pled guilty for Tong Shing's "preparing and serving

food to the public from an unclean and insanitary public eating and drinking place and not maintaining proper temperatures." Tong Shing was sentenced with a fine on Feb. 25, 2002. After the prosecution was complete, Agent Sweeny conducted a follow-up inspection on April 1, 2002, and found repeat and critical violations that resulted in a three-hour closure of the facility to which Mr. Zhong agreed.

Agent Sweeny returned to the restaurant when it was supposed to be closed, and saw that it was open. Because she saw some improvements, she allowed it to remain open but notified Mr. Zhong that she would return in the morning. Agent Sweeny returned the following morning, noted some improvement, but also found repeat violations. Mr. Zhong promised to correct those violations within a week. The follow-up inspection of April 22, 2002, noted many repeat violations, which Mr. Zhong again agreed to correct.

Agent Sweeny submitted frozen dessert samples for testing in March, April, May and July 2002. Because the lab results were repeatedly abnormal, she requested a citation against Tong Shing. District Justice Frey accepted Mr. Zhong's guilty plea for Tong Shing and imposed a fine.

During 2002, Agent Sweeny found repeated food temperature violations, obtained voluntary closure of Tong Shing, discarded food, and prosecuted Tong Shing on at least two occasions. As inspections worsened, Agent Sweeny noticed a gradual change in Mr. Zhong's attitude toward her.

Agent Sweeny planned to inspect Tong Shing on March 13, 2003, but was not able to do it that day. On March 23, 2003, Mr. Zhong claims that Agent Sweeny and her husband had dinner at Tong Shing, that Mr. Sweeny paid the bill after Agent Sweeny left the restaurant, and that the couple had been given a twenty percent discount rather than a fifty percent discount. Mr. Zhong claims that Agent Sweeny knew of the discount reduction switch and it angered her. Agent Sweeny denies knowing of any discount. On March 24, 2003, Agent Sweeny performed the inspection of Tong Shing which had been planned for March 13th. She noted critical and repeat violations with food temperature and cleanliness. She also did a routine frozen desert inspection which resulted in another warning letter. Mr. Zhong claims the Agent Sweeny discarded sixty pounds of chicken during that inspection.

On May 7, 2003, Agent Sweeny conducted a post-warning re-inspection of Tong Shing. Because she found many repeat and critical violations, Agent Sweeny requested prosecution. Supervisor Kinder prepared the citation. Mr. Zhong entered a plea of "not-guilty" for Tong Shing in July 2003. At the hearing, on September 8, 2003, District Justice Frey found Tong Shing guilty of Food Code violations, but did not fix a penalty.

Pursuant to District Justice Frey's request, Agent Sweeny did follow-up inspections of the restaurant. On September 18, 2003, she again found multiple repeat and critical violations, and submitted a report to District Justice Frey who imposed a fine. Agent Sweeny also did a compliance frozen dessert inspection. Because the lab results

were abnormal, Tong Shing was cited again. Mr. Zhong pled guilty to frozen dessert violations in December 2003.

On February 26, 2004, a customer of the restaurant saw a cockroach and lodged a consumer complaint. The complaint triggered another inspection of Tong Shing on March 15, 2004. Agent Sweeny's report of the inspection describes filth and temperature problems, with fourteen violations, including three critical ones. Mr. Zhong agreed to a voluntary closure from 12:30 to 3 p.m. to allow for a clean-up. Agent Sweeny permitted the restaurant to re-open after re-inspection, although multiple violations remained.

### B.    Events between May 12, 2004 and May 12, 2006 – Timely for RICO Claim but Outside the Statute of Limitations for Civil Rights Claims

Agent Sweeny requested leave to prosecute Tong Shing for Food Code violations in late 2004. Her request summarized relevant violation history dating back to 2002 including unsanitary conditions, inadequate food temperatures, inadequate supplied hand wash stations, and failure to keep outside doors closed. The citation was filed in August 2004. Mr. Zhong pled not-guilty. At a hearing on November 16, 2004, District Justice Frey found the restaurant guilty, but allowed time for a follow-up inspection before imposing a sentence. Agent Sweeny and another agent conducted the follow-up inspection on November 22, 2004. The inspection resulted in a low score, and District Justice Frey imposed a fine. No inspection after November 22, 2004 and before January 26, 2005 is recorded.

Mrs. Zhong testified that she recalls Supervisor Kinder accompanying Agent

Sweeny to the restaurant sometime in December 2004 on a day when Mr. Zhong was not present. Supervisor Kinder ordered Mrs. Zhong to close the restaurant because buckets were on the floor. Supervisor Kinder testified that his observation of Mrs. Zhong's behavior led him to be concerned for Agent Sweeny's safety. As a result, Supervisor Kinder wanted Agent Sweeny to inspect Tong Shing accompanied by another agent as a safety precaution.

On January 26, 2005, Agent Sweeny performed a follow-up "compliance" inspection required by the low score from the inspection on November 22, 2004. Agent Sweeny arrived at noon and conducted the inspection alone according to Mrs. Zhong. Agent Sweeny ordered Mrs. Zhong to close the restaurant so it could be cleaned. The report refers to repeat and critical violations. Mrs. Zhong asked whether if she finished cleaning, she could she re-open. Agent Sweeny responded, "Okay." Agent Sweeny gave Mrs. Zhong her business card and asked her to call when everything was clean and fixed to reschedule an inspection. Mr. Zhong was not present during this inspection. Around 3:00 in the afternoon, Mrs. Zhong called Agent Sweeny's phone number and left a voicemail message: "Tong Shing Restaurant. Clean. Finish. Come. Come." Had the Bureau's secretary retrieved this message, she would have forwarded it to Agent Sweeny. The secretary did not, however, retrieve the message, and so Agent Sweeny did not receive it. Mrs. Zhong re-opened the restaurant after cleaning it and leaving the voicemail message for Agent Sweeny. Agent Sweeny informed Supervisor Kinder that

she had to drive to Philadelphia to work the next day.

Supervisor Kinder believed that it would take an entire day to clean the restaurant sufficiently to permit its re-opening. To be certain that Tong Shing had not re-opened without authorization, he directed Agent Phillips to order take-out food that evening, and to close the restaurant if it had re-opened. In light of his observation of what he interpreted as Mrs. Zhong's irate behavior, Supervisor Kinder told Agent Phillips not to go to the restaurant alone.

After successfully ordering take-out food, Agent Phillips arrived at Tong Shing after 7 p.m., accompanied by a police officer to close Tong Shing. Agent Phillips called Supervisor Kinder after closing the restaurant, and Supervisor Kinder told Agent Phillips to notify the Morning Call, the region's local newspaper. Agent Phillips called and reported that Tong Shing was closed, but provided no details. Agent Sweeny did not report any incidents to the press, and learned later that Supervisor Kinder had directed Agent Phillips to go to Tong Shing, and then to call the newspaper.

On the following day, a newspaper reporter spoke with Supervisor Kinder who had just learned that a customer had also reported the closure of the restaurant to the Morning Call. The information provided by the Bureau employees was public information. Later that day, Agent Phillips re-inspected Tong Shing and allowed it to re-open at about 2 p.m., even though some violations remained.

The Morning Call reported that day that Tong Shing was closed for a day because

of health violations, after it did business despite the Bureau's Order to close. Another local newspaper also reported the story.

Agent Sweeny asked Supervisor Kinder to assign another agent to inspect Tong Shing, thinking that it would come into better compliance. Supervisor Kinder agreed, and Agent Sweeny was not assigned to inspect Tong Shing again.

Agent Phillips and Supervisor Kinder inspected Tong Shing on February 16, 2005, and found improvement in its condition. Mr. Zhong alleges that the report of that inspection is fake because it lacks the agent's signature. Establishment copies, however, frequently lacked signatures.[5]

Mr. Zhong met Supervisor Kinder one time in early 2005. He told Supervisor Kinder that the restaurant was doing well but that Agent Sweeny had had a personal grudge related to the 2003 "discount" incident. Supervisor Kinder remembers Mr. Zhong complaining to him about Agent Sweeny, but that he refused to file a formal complaint against her.

Agent Barrett replaced Supervisor Kinder who retired on April 1, 2005. In June 2005, Agents Phillips and Briner conducted a compliance inspection of Tong Shing. They found eight violations, four of which were critical. The agents requested a warning letter, but the new supervisor denied the request. A couple of weeks later, Agents Phillips

---

[5] The Bureau initiated new software in the agents' laptops in December 2005. Before then, agents did not typically get a signature on all their reports. Under the new system, however, signatures were not accepted at first and sometimes did not show up on printouts. It took a couple of years for the program to work properly.

and Briner responded to a consumer complaint about spoiled chicken.  Upon inspection, the agents found three violations, including two critical ones.  The Zhongs were not present during this inspection.  The agents returned on July 1, 2005 for a follow-up inspection.  Corrections were noted.  On July 13, 2005, they followed-up again.  They noted more corrections but also temperature violations.  This was Agent Phillip's last inspection of Tong Shing.

The record contains a fully-integrated contract of sale between the plaintiff and Jon Zhang of Jackson Heights, New York, executed on November 1, 2005, for the purchase of all the equipment and inventory which had been utilized for Tong Shing Restaurant.  The price was fixed at $58,000.  See Document #42-12 at 25-28, 29.  Also on November 1, 2005, Jin Wen Zhong, the plaintiff's brother, registered a new enterprise with the Commonwealth of Pennsylvania named Peking Garden to be located at the same address where Tong Shing Restaurant had been located, and identified himself as the one hundred percent owner and sole proprietor.[6]  See Document #42-10 at 12.  On the same date, Jin Wen Zhong also filed a Form SS-4 with the U.S. Internal Revenue Service as an application for an employer identification number for Peking Garden, again claiming to be the sole proprietor.  See Document #42-12 at 31.

After the Pennsylvania Auditor General's 2005 audit, Bureau agents focused on

---

[6] It is unclear from the record how Jin Wen Zhong acquired the restaurant from Jon Zhang on November 1, 2005.  What is important for our purposes here is that the plaintiff sold his interest in it on the same date.

inspecting restaurants at least annually. Inspection frequency before the audit was based on risk factors, and restaurants were high risk.

By January 2006, the Bureau of Food Safety inspection reports no longer included scores. Restaurants that were non-compliant were listed on a publicly available website. Reports noted that a facility was in or out of compliance as to each violation. High risk violations were numbered from 1 to 27.

When Agent Sweeny noticed a name change at Tong Shing's location, she went to inspect the restaurant on January 26, 2006. She learned that the owner of Peking Garden was Jin Wen Zhong, the plaintiff's brother. Because food establishment licenses are not transferable, Peking Garden was operating without a valid license. Agent Sweeny's report notes violations in temperature and cleanliness, and indicated:

> This facility is not in compliance. At this time, it does not
> qualify for licensing. Owner is to call Regional Office
> 610-489-1003 to schedule a licensing inspection when facility
> is ready. It can not operate until it is licensed.

On January 30, 2006, Agent Sweeny returned to Peking Garden with Agent Welte. The agents conducted both a Food Code inspection and a frozen dessert inspection. They approved the restaurant to operate, received the license payment, and scheduled a follow-up inspection to verify ongoing compliance and sanitation issues. The report of the frozen dessert noted that as a new firm, the restaurant's freezer must be tested weekly for three weeks, followed by monthly testing.

Agents Welte and Sweeny next inspected Peking Garden on February 9, 2006, and

noted repeat violations. Agent Sweeny next inspected Peking Garden on March 1, 2006, and again noted repeat violations.

### C. Events After May 12, 2006 – Within the Statute of Limitations for RICO claim and Civil Rights Claims

After six months in business, Jin Wen Zhong sold Perking Garden to Owen Zhong, the plaintiff's son, for $50,000. <u>See</u> Document #42-12 at 54-57, 58. The record contains the fully-integrated contract of sale whereby Owen Zhong purchased all of the equipment, inventory, and assets of Peking Garden from Jin Wen Zhong, his uncle, who indicated that he was the owner of the restaurant and was able to transfer good and marketable title to his nephew. <u>Id.</u> On May 15, 2006, Owen Zhong registered his trade name as Peking Garden, claiming that he was the sole proprietor of the restaurant which he began operating at Tong Shing's old address. <u>See</u> Document #42-10 at 19-23. The plaintiff managed Peking Garden for his son.

On June 9, 2006, Agents Sweeny and Welte prepared two inspection reports for Peking Garden. One was an "out-of-business" inspection, and the second noted a new owner. The second report notes that the restaurant had been operating without notifying the Bureau of Food Safety of the change of ownership, and identifies the new owner as a family member of the previous owner. The Bureau policy is that a new owner means a new establishment, even if the manager remains. The report describes numerous violations, and explains that a new facility with critical violations cannot be licensed:

The manager has been informed about maintaining

> temperature control in the buffet areas in the past and has
> been instructed about the use of racks and the need for using
> log sheets if using timing as a barrier. This process has been
> explained by several sanitarians over the last couple of years.
> The facility has been operating without a license. Due to the
> violations, this establishment will not be licensed at this time.
> It will be licensed when the violations are corrected. Facility
> is not to open until licensed.

Upon re-inspection on June 12, 2006, Peking Garden, under the new ownership of Owen Zhong, was licensed even though the follow-up licensing inspection that day still found violations. A month later, Agent Sweeny returned to inspect the new facility after it had been in operation. She requested that Supervisor Barrett accompany her because he was supposed to observe annually, and because of continued repeat violations at the facilities managed by Mr. Zhong. They noted violations. When Owen came for a weekend soon afterward and checked out the restaurant, he did not notice any violations. The July 14, 2006 inspection was the last inspection that Agent Sweeny conducted at Peking Garden.

On July 17, 2006, Supervisor Barrett sent a warning letter to Owen Zhong as the owner of Peking Garden and to the plaintiff as its Manager. The letter delineates deviations from appropriate practices.

On February 15, 2008, Agents Miller and Quarmly inspected Peking Garden and found numerous violations of the Food Code. Agent Miller's follow-up inspection revealed some violations regarding the prevention of food contamination.

Ten counts remain in the amended complaint which include various violations of

the Constitutions of the United States and Pennsylvania; conspiracy to interfere with civil rights; RICO; "state's police power;" "state Ethics Act;" violations of Pennsylvania's Health and Safety statute; and "supervisor liability."

## II. STANDARD OF REVIEW

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials. FED.

R. CIV. P. 56(c)(1)(A). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322. Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

While the events in this record span several years, many of them occurred outside the statute of limitations and are thus irrelevant here. In fact, the plaintiff had already sold his interest in Tong Shing Restaurant before May 12, 2006, the relevant date for the claims of civil rights violations. Accordingly, the two-year statute of limitations is fatal to the civil rights claims alleged in the amended complaint. Finally, although the statute of limitations for the RICO claim begins two years earlier, the corporate structure of Tong

16

Shing Restaurant, Inc., does not provide the plaintiff with standing to proceed with any of the claims in the amended complaint.

## A.  Mr. Zhong's Concession

Notwithstanding these deficiencies in the case, the plaintiff has conceded in his responsive brief to the motion, that the defendants are entitled to summary judgment in Counts 1 and 4.  Accordingly, I will grant the defendants' motion for summary judgment as to Counts 1 and 4, and enter judgment in favor of the defendants on those counts.

## B.  Standing

The defendants argue that Mr. Zhong does not have standing to bring the claims in the amended complaint, particularly because of the corporate structure of the restaurant, and the timing of the events alleged.[7]  I agree.

Article III, Section 2 of the United States Constitution limits the judicial power of the United States to the resolution of "cases" or "controversies."  Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 470 (1982); see also Khodara Environmental, Inc. v. Blakey, 376 F.3d 187, 193 (3d Cir. 2004) (quoting United Food and Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996)).  The existence of a case or controversy is a prerequisite to all federal actions.  The Joint Stock Society v. UDV North America, et al., 266 F.3d 164, 174

---

[7]  The relevant time within which any claims in the amended complaint may be considered lies between May 12, 2004, the date the statute of limitations began to run for the RICO claim, and November 1, 2005, the plaintiff's sale of the restaurant.

(3d Cir. 2001). Standing ensures that "plaintiffs have a 'personal stake' or 'interest' in the outcome of the proceedings, 'sufficient to warrant . . . [their] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on . . . [their] behalf.'" Id. at 175. Over the years, the Supreme Court of the United States has established that the irreducible constitutional minimum of standing contains three elements. Lujan v. Defenders of Wildlife, et al., 504 U.S. 555, 560 (1992). First, a plaintiff must clearly demonstrate that he has suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Id. Second, there must be a causal connection between the injury and the conduct of which the plaintiff complains: that is, the injury must be fairly traceable to the challenged action of the defendants. Id. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Id. As the party invoking federal jurisdiction, the plaintiff must demonstrate each of these elements. Id.

Here, I am not convinced that Mr. Zhong has a "personal stake or interest" in the outcome of these proceedings sufficient to warrant the invocation of this court's jurisdiction, or to justify exercise of the court's remedial powers on his behalf. Indeed, Mr. Zhong has failed to establish that he has suffered an injury in fact. During the relevant period in this case, he was the sole shareholder of an S corporation. A corporation is a distinct and separate entity, irrespective of the ownership of the stock,

and the fact that one person owns all its stock does not make him and the corporation one and the same.  United National Ins. Co. v. M. London, Inc., 487 A.2d 385, 391-392 (Pa. Super. 1985).  A stockholder of a corporation does not acquire standing to maintain an action in his own right when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares.  Winer Family Trust v. Queen, 503 F.3d 319, 338 (3d Cir. 2007) (citing Kauffman v. The Dreyfus Fund, Inc., 434 F.2d 727, 732 (3d Cir. 1970)).  It is axiomatic that a stockholder, director, officer or employee of a corporation has no individual right of action against third persons for damages that result indirectly to the individual because of an injury to the corporation.  Chrysler Credit Corp. v. B.J.M., Jr., Inc., 834 F. Supp. 813, 838 (E.D. Pa. 1993).  Diminution of the value of corporate assets does not constitute direct individual harm and thus does not confer standing on a shareholder.  Motley Assocs. v. Rumbaugh, 104 B.R. 683, 687 (E.D. Pa. 1989).  Personal loss incurred as a result of a corporation's losses generally does not constitute an individual loss sufficient to confer standing, even where the individual is a sole shareholder or key employee.  Grimm v. Borough of Norristown, 226 F. Supp. 2d 606, 632 (E.D. Pa. 2002).  Even where a Section 1983 claim involved allegations that citations were wrongly issued, an individual lacked standing to sue for those citations which had been issued to the corporation through which he did business.  Grimm, 226 F. Supp. 2d at 632.

The record in this case contains ample documentary evidence to show that Mr. Zhong was never the owner of Tong Shing Restaurant. That evidence, including tax returns,[8] contracts of sale,[9] and corporation filings,[10] unequivocally demonstrates that Tong Shing Restaurant was owned by an S Corporation known as Tong Shing Restaurant, Inc. Other evidence submitted as support for the claims in the amended complaint points to the defendants' alleged targeting of Tong Shing Restaurant, not of Mr. Zhong. By forming an S Corporation on July 12, 1999, Mr. Zhong decided to shield himself from personal liability. That decision also, however, stripped him as an individual of any standing to bring a claim in federal court for injuries or wrongs suffered by the restaurant. Neither the corporation nor the subsequent owners of the restaurant were hindered in any way from bringing this action against the defendants.

Further, Mr. Zhong's theory that he somehow suffered individually due to the defendants' conduct also fails. His alleged injury relates to the diminution of the corporation's assets, which is insufficient to confer standing on an individual, even if he

---

[8] The record contains tax returns (IRS Form 1120S) for an S Corporation known as Tong Shing Restaurant, Inc., for tax years 2001, 2002, 2003, 2004, and 2005. See Document #42-10 at 26-30. The record also contains tax returns (IRS Form 1040, Schedule C) filed by Owen Zhong as the sole proprietor of Peking Garden for tax years 2006 and 2007. Id. at 31-32.

[9] See Contract of Sale between the plaintiff and Jon Zhang (Document #42-12 at 25-28, 29) and Contract of Sale between Jin Wen Zhong and Owen Zhong (Document #42-12 at 54-57, 58).

[10] The record contains the certified copy of the Pennsylvania Enterprise Registration filed by Tong Shing Restaurant, Inc. See Document #42-10 at 3-7. The document reflects that the S Corporation was incorporated in Pennsylvania on July 12, 1999, and opened for business on November 1, 1999. Id.

is the sole shareholder.  See Motley, supra.  Mr. Zhong further cannot allege an injury as the landlord of the commercial building in which the restaurant was located.  The record contains Mr. Zhong's personal tax returns (IRS Form 1040 - Schedule E) for the tax years 2002 through 2005 which show increasing rental income received from the restaurant over those years.  See Document #42-10 at 33-36.

The plaintiff's status as employee/manager of his brother's and/or his son's restaurants also does not confer standing.  The general rule is that an employee does not have standing to sue when the alleged misconduct is directed at the corporation for which he worked and, therefore, the employee's loss of income or employment is merely incidental to the direct injury inflicted upon the corporation.  Pagan v. Calderon, 448 F.3d 16, n.2 (1st Cir. 2006).  An exception to this rule would allow a shareholder to bring an action if he sustains an injury that "is peculiar to him alone, and [that] does not fall alike upon other stockholders."  Id. at 17 (quoting Roeder v. Alpha Indus., Inc., 814 F.2d 22, 30 (1st Cir. 1987)).  Any of the losses or injuries allegedly suffered at the hands of the defendants were losses or injuries of the corporation alone.  Mr. Zhong may have indirectly suffered some financial loss as a result of Tong Shing's decline in business, but that is insufficient to confer standing on Mr. Zhong.  Accordingly, I find that Mr. Zhong lacks standing as the sole shareholder of a corporation to bring any claim here for injuries suffered by that corporation.  I will grant the defendants' motion in its entirety, and enter judgment on their behalf.  An appropriate Order follows.